UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DEIRDRE ROSSING,
    *Plaintiff*,

v.

McELROY, DEUTSCH, MULVANEY &
CARPENTER, LLP,
    *Defendant*.

No. 3:18-cv-00413 (JAM)

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

Plaintiff Deirdre Rossing was employed as a legal assistant by the law firm of McElroy, Deutsch, Mulvaney & Carpenter, LLP ("MDMC") before she was fired in July 2016. She has filed this lawsuit against MDMC, alleging that it subjected her to disability discrimination and retaliation. MDMC has now moved for summary judgment on all counts. For the reasons set forth below, I will deny the motion.

**BACKGROUND**

The facts here are taken from both parties' Local Rule 56 statements of material fact, their submissions, and the pleadings, and they are presented in the light most favorable to Rossing as the nonmoving party.

From 2010 to 2016, Rossing worked as a legal assistant in MDMC's Hartford office, primarily supporting the work of three attorneys, although she also reported to Susan Gay, who was MDMC's regional office administrator. Docs. #1 at 3-4 (¶¶ 11, 14, 17-18), #10 at 2-3 (¶¶ 11, 14, 17-18). Rossing's responsibilities included administrative tasks such as scheduling, corresponding with clients, preparing pleadings, and reviewing documents. Doc. #38 at 1 (¶ 1).

1

In her 2014-15 performance review, all her supervisors rated Rossing as "satisfactory," "very good," or "excellent" for the skills on which she was evaluated. Doc. #37-10 at 1-4. One of Rossing's supervisors added that "[Rossing] is generally available when [he] ha[s] a need and she accommodates the demands of [his] practice," Doc. #37-11 at 5, and he testified in a deposition that this was true for the entire time Rossing worked at MDMC, Doc. #37-8 at 8-9.

In 2015, Rossing, who suffers from degenerative disc disease, foot impairments, and diabetes, began taking extensive leaves from work. Docs. #1 at 3 (¶¶ 12-13), #37-3 at 2, 5, 7, 29, 57, #38 at 11 (¶ 40), 13 (¶ 48). From June to July 2015 she took leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq.*, Doc. #31-1 at 74, then short-term disability leave from August to September 2015, *id.* at 33, interrupted only by a brief four-hour return to work, *id.* at 76, 78. After returning in September 2015, she suffered unpredictable bouts of pain from her degenerative disc disease such that she took various days of paid time off ("PTO") in October and November. *Id.* at 41-46, Doc. #37-3 at 7-9. Finally, Rossing took an additional FMLA leave starting in December 2015. Doc. #31-1 at 72.

MDMC staff members received their customary holiday bonuses in December 2015, but Rossing only received hers when she asked Gay about it two weeks later. Doc. #37-3 at 16. In an email to Gay at the time of Rossing's request, John Dunlea, the firm's Chief Financial and Operating Officer, called Rossing's request "[u]nreal." Doc. #37-22 at 1.

In March 2016, Rossing returned to work from her now-exhausted FMLA leave without restrictions. Docs. #31-1 at 33, 84, #38 at 4 (¶ 14). Gay advised Rossing that her 2015-16 performance review was "waived" because of her "FMLA leave for a good part of 2015 and two months into [2016]," and that neither Rossing nor her supervising attorneys needed to fill out

2

evaluations. Doc. #37-32 at 2. One of the attorneys responded to Rossing in an email, "But when you were here, you were EXCELLENT!!!!!" Doc. #37-27 at 1.

Rossing, however, objected to the denial of a performance review, because a review would serve as the basis for any salary increase, and she told Gay that the denial seemed to be in retaliation for her FMLA leaves. Docs. #37-26 at 1, #37-29 at 1. Dunlea later testified that Rossing was denied a review because she had been absent for 21 weeks of the one-year review period, although he acknowledged that the firm "in most cases" evaluates employees who are absent for as many as six months. Doc. #37-5 at 4, 16, 26-27.

The lack of a performance review was not Rossing's only problem at work. Based on a doctor's note from 2003, Rossing had a disability accommodation to wear sneakers at work. Docs. #37-18 at 1, #38 at 13 (¶ 48). But Gay grew suspicious about Rossing's need to wear sneakers after occasionally seeing her wear "regular shoes." Doc. #37-4 at 81. In April 2016, Gay asked Rossing for an updated doctor's note confirming her need to wear sneakers, separately noting in an email to benefits manager Christina Insigna that Dunlea "gets frustrated every time he comes to Hartford and sees her." Docs. #37-18 at 3, #37-25 at 1. Gay also suggested that Rossing's doctor would give her a note regardless of whether she actually needed the accommodation. Doc. #37-18 at 1. Rossing later submitted an updated note, Doc. #37-4 at 82, and she requested to meet with Dunlea about her lack of a performance review, Doc. #37-32.

This resulted in a meeting on May 3, 2016. According to Rossing, she arrived for the meeting and was surprised to find Gay and managing partner Suzanne Baldasare were there too. Although Rossing understood the purpose of the meeting to discuss her lack of a performance review, the meeting turned hostile against Rossing surrounding her disabilities. Dunlea opened the meeting by interrogating her about her sneakers accommodation, "berated" and "drilled" her

3

about her disabilities, and accused her of planning to sue the firm. Docs. #37-3 at 17, 28-37, 55-59, #37-24. Dunlea then instructed Rossing that her annual review was being waived due to her absences, and that she would "possibly" receive an updated review in November 2016 if she worked for six uninterrupted months. Docs. #31-1 at 126, #37-3 at 38, #37-24.

Later in May 2016, Rossing took two days off unrelated to disability to remove a cyst, and she took two-and-a-half more days off because of side effects from her post-procedure antibiotics. Docs. #31-1 at 90, #38 at 4-5 (¶¶ 15-17). She was scheduled to have a pain-relieving epidural injection on May 27—the Friday before Memorial Day weekend—but it was canceled the morning of the planned injection because her insurance company denied coverage. Docs. #37-34 at 1, #38 at 5-6 (¶¶ 18, 21). Rossing did not report to work because she had already scheduled PTO, Doc. #31-1 at 18-20, although she later averred that she had also taken off because of increasingly debilitating pain, Doc. #37-2 at 2 (¶ 10). She said she took off the day before to sterilize her home in advance of the scheduled procedure, which she later acknowledged "[m]aybe" could have been done after work, and because she "was just taking a day off for a long weekend." Doc. #31-1 at 18-20.

On May 31, 2016, Rossing's leg gave out and became painful such that she was unable to sit, stand, or walk for more than ten minutes at a time. *Ibid.*, Doc. #38 at 7 (¶¶ 23-24). She took PTO that week. Doc. #37-35. MDMC approved her for short-term disability leave on June 7, with a May 31 eligibility date, after she submitted a doctor's note suspending her from work for a period that was twice extended to July 20. Docs. #37-34, #37-35, #37-39, #37-40, #38 at 8 (¶¶ 25-26).

In the meantime, Rossing's insurance covered an epidural injection on June 30, 2016, Doc. #37-3 at 6, 10, which made her pain "manageable," Doc. #37-2 at 3 (¶¶ 12-15). Although

she did not "know" whether her debilitating condition would recur, she felt after the procedure that she would "likely" be able to work without interruption. Doc. #37-3 at 47-48. Rossing returned to work without restrictions on July 20, completing a full day. Doc. #38 at 8-9 (¶¶ 27, 29).

But Rossing missed work again the next day. She left a voicemail on Gay's phone at 6:00am on July 21, explaining that she had "horrendous gas" and what she suspected was stomach flu; she further noted that she "hope[d] to" then emphasized that she "will" attend work "tomorrow." Docs. #31-1 at 99, #37-5 at 56.

Gay immediately took steps to terminate Rossing's employment that same morning. She drafted a termination letter, which Baldasare endorsed and Dunlea signed. Docs. #37-4 at 125-26, 37-41, 37-42. The final termination letter stated that Rossing had exhausted her FMLA leave on March 2, 2016, that the firm had afforded her additional leave that was not required by law in the hope that she could return but that "[y]our absence today has led us to conclude that you are unable to attend work on a regular basis" and that "[w]e cannot run our business without regular and consistent attendance by our staff members." Doc. #31-1 at 86.

Rossing filed this action in 2018 for discrimination and retaliation against MDMC. Counts One and Two allege disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-58 *et seq.* Counts Three and Four allege retaliation in violation of the ADA, CFEPA, and the FMLA. Doc. #1 at 13-18. MDMC has now moved for summary judgment on all counts. Doc. #29.

**DISCUSSION**

The principles governing the review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

***Counts 1 and 2 – ADA and CFEPA disability discrimination***

Rossing alleges that she was subject to disability discrimination in violation of the ADA and CFEPA. Both the ADA and CFEPA prohibit discrimination on the basis of disability and apply the same legal framework to the discrimination analysis. *See Green v. Cellco Partnership*, 218 F. Supp. 3d 157, 162-63 (D. Conn. 2016). The claims are subject to the familiar *McDonnell Douglas* burden-shifting standard. *See Cortes v. MTA New York City Transit*, 802 F.3d 226, 231 (2d Cir. 2015); *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).

Thus, a plaintiff may establish a *prima facie* case for discrimination if she can show that: (1) her employer is subject to the ADA/CFEPA; (2) that she was disabled within the meaning of the ADA/CFEPA; (3) that she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) that she suffered adverse employment action because of her disability. *Green*, 218 F. Supp. 3d at 162. The Second Circuit has described

a plaintiff's burden at this *prima facie* stage to be "not a heavy one" and "minimal." *McDonnell v. Schindler Elevator Corp.*, 618 F. App'x 697, 698 (2d Cir. 2015).

If the plaintiff succeeds in meeting this initial burden, then the employer may counter by proffering a legitimate, nondiscriminatory reason for its action. *See Cortes*, 802 F.3d at 231. Then, if the employer does so, the plaintiff may still succeed on her claim if she can show that the proffered reason was a "pretext" for discrimination—that is, by showing that her employer's stated reason was untrue or incomplete and that it was discrimination that played a causal role in her termination. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010); *see also DeAngelo v. Yellowbook, Inc.*, 105 F. Supp. 3d 166, 174-78 (D. Conn. 2015).

MDMC does not contest for present purpose that it is subject to the ADA and CFEPA, or that Rossing was disabled. Instead, it argues (1) that Rossing was not a "qualified individual" within the meaning of the ADA, and (2) that—in light of her irregular work attendance—there is no genuine fact issue to show that she was terminated because of her disability rather than because of her lack of regular work attendance. Doc. #30 at 12-17.

   1. *Qualification*

Under the ADA, "[t]he term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. 1630.2(m). Ample precedent makes clear that regular work attendance is an essential function of a job. *See, e.g.*, *Vitti v. Macy's Inc.*, 758 Fed. App'x 153, 157 (2d Cir. 2018).

The record shows highly irregular work attendance by Rossing. She took medical leaves or was otherwise unable to work for approximately five months during the period from June

7

2015 to July 2016. Nevertheless, I must view the record not merely by reference to whether Rossing was *previously* unable to establish regular work attendance but by reference to whether in light of all the circumstances she would *in the future* be able to perform her job with regular work attendance. *See Teahan v. Metro-North Commuter R.R.*, 951 F.2d 511, 521 (2d Cir. 1991) (noting "forward-looking" nature of the "qualified" inquiry).

I think Rossing has carried her minimal burden in this respect. She has shown that she was medically cleared to resume work as of July 20, 2016, and that her one-day absence for a stomach bug on July 21 did not necessarily mean that she was about to resume another round of serial absences. Accordingly, I will decline to grant summary judgment on grounds that Rossing was not qualified to do her job.[1]

   *2. Causation*

MDMC next argues that Rossing was not terminated "because of" her disability. As the Second Circuit has recently made clear, the governing causal standard for an ADA discrimination claim is "but-for" causation rather than the lesser "motivating factor" standard. *Natofsky v. City of New York*, 921 F.3d 337, 346-50 (2d Cir. 2019). Although the causal standard may remain unsettled for a CFEPA disability discrimination claim, I will assume for purposes of this ruling that the Connecticut courts would follow the higher federal standard as well.

Notwithstanding that MDMC has carried its burden to articulate a facially neutral reason for Rossing's termination (namely, that Rossing's attendance record was very poor), I conclude that there is at least a genuine fact issue whether she would not have been terminated but for

---

[1] MDMC relies on *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961 (8th Cir. 2006), in which a court held that "an employee who *cannot* attend work cannot perform the essential functions of his job." *Id.* at 966 (emphasis added). Importantly, the plaintiff there did not argue that he was able to regularly attend work when he was terminated but rather that "a jury could infer that regular attendance was not actually expected of him." *Ibid.* The Eighth Circuit disagreed and found that his 96-day absence in a one-year span was enough to conclude that he could not. *Id.* at 966-67. Here, Rossing quite vigorously asserts that she could regularly attend work notwithstanding prior absences.

8

disability discrimination. Shortly after Rossing returned to work in March 2016, Gay demanded a doctor's note to justify her longstanding disability accommodation to wear sneakers at work, in part because Dunlea was "frustrated" at seeing her wear them. During a subsequent meeting in May, Rossing accused Dunlea of interrogating her about the accommodation. Even MDMC acknowledged at the motion hearing that there were "snarky" emails sent among MDMC personnel in response to Rossing's requests for accomodation. Perhaps such emails might simply have reflected exasperation at Rossing's continued absences, but a reasonable jury might find in light of the timeline involving disability-related absences and events that they reflect some level of animus against Rossing because of her disability.

On top of all this, Rossing points to evidence that she was fired in an irregular manner. She had not been previously warned that she would be subject to discipline or termination because of her absences. When she called in sick early on the morning of July 21, 2016, MDMC moved almost immediately that same morning to terminate her, all without consulting with the attorneys for whom she worked and despite her statement of intention to return to work the next day. These facts raise questions about whether MDMC's stated reason for terminating Rossing's employment was incomplete and thus pretextual.

MDMC argues that Rossing was fired only *after* she had returned to work from disability leave and because of an absence that was due to illness having nothing to do with disability. But the termination came just one day after her return from disability leave, and even Dunlea acknowledged a linkage to past events when describing her absence on July 21 as the "final straw" leading to her termination. Doc. #37-4 at 119.

9

I conclude that Rossing has demonstrated a genuine fact issue as to whether she suffered disability discrimination under the ADA and the CFEPA. Accordingly, I will deny MDMC's motion for summary judgment with respect to Counts One and Two.

*Count Three – ADA and CFEPA retaliation*

Retaliation claims under the ADA and CFEPA are analyzed under the same *McDonnell Douglas* burden-shifting framework. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552, 556 (2d Cir. 2010) (citing *Craine v. Trinity Coll.*, 791 A.2d 518, 531 n.6 (Conn. 2002)). "To establish a *prima facie* case of retaliation under the ADA, a plaintiff is required to show by a preponderance of the evidence that: (1) she participated in a protected activity under the ADA; (2) the defendant knew of the protected activity; (3) the plaintiff experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action." *Rios v. Dep't of Educ.*, 351 Fed. App'x 503, 505 (2d Cir. 2009) (citing *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).

MDMC concedes for purposes of this motion only that Rossing's accommodation requests—to wear sneakers and to take a leave of absence to treat her degenerative disc disease in June and July 2016—were protected activity. *See Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002) ("[S]eeking reasonable accommodation of . . . disability . . . constitutes protected activity under Section 504/ADA.").

Largely on the same or overlapping grounds that it contests Rossing's discrimination claims, MDMC argues that no reasonable jury could conclude that it retaliated against Rossing because of her protected activity. Doc. #30 at 17-18. I conclude, however, that the sequence of events within several months relating to her claims for an accommodation and the animus she encountered at the May 3 meeting are enough to create a jury question on retaliatory intent.

Although temporal proximity alone is not sufficient to sustain a retaliation claim at the summary judgment stage, *see Abrams v. Dep't of Pub Safety*, 764 F.3d 244, 254-55 (2d Cir. 2014), it is probative in conjunction with other factors. I conclude that genuine fact issues remain, and therefore I will deny MDMC's motion for summary judgment for Count Three.

### *Count Four – FMLA retaliation*

FMLA retaliation claims are also subject to the same type of *McDonnell Douglas* burden-shifting analysis. "To establish a prima faci[e] case of FMLA retaliation, a plaintiff must establish that 1) [s]he exercised rights protected under the FMLA; 2) [s]he was qualified for h[er] position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016). A negative or motivating factor causation standard applies to the fourth element of FMLA retaliation claims. *See Woods v. START Treatment & Recovery Centers, Inc.*, 864 F.3d 158, 167-69 (2d Cir. 2017).

Rossing alleges that MDMC retaliated against her for taking FMLA leaves by denying her a performance review in March 2016, and also retaliated against her repeated complaints about this denial by terminating her in July 2016. Doc. #37 at 20, 25-26. As to the first claim, MDMC argues that the denial of a performance review does not rise to the level of a "materially" adverse employment decision. Doc. #30 at 20. As to the second, MDMC argues that there are no grounds to infer retaliatory intent because of the temporal gaps between the end of her FMLA leave in March 2016 and her March-to-May complaints about the denial of a performance review on the one hand, and her July termination on the other. *Id.* at 19-20, Doc. #40 at 12-15.

As to Rossing's first claim, "a materially adverse action is any action by the employer that is likely to dissuade a reasonable worker in the plaintiff's position from exercising [her]

legal rights." *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011). For example, "[a] formal reprimand issued by an employer" is materially adverse because it "is not a 'petty slight,' 'minor annoyance,' or 'trivial' punishment; it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that [her] job is in jeopardy." *Id.* at 165. If a reduction in the *likelihood* of receiving future raises constitutes materially adverse employment action, surely a reasonable jury could find that an outright *preclusion* of a raise through the denial of a performance review does.

As to Rossing's second claim, contrary to MDMC's assertions, even the temporal gap between the end of Rossing's FMLA leave in March 2016 and her termination in July does not preclude her from establishing causation. *See Abrams*, 764 F.3d at 254 (noting "five months might be enough to establish a prima facie case" of Title VII retaliation). And because Rossing opposed the denial of a performance review as late as May 2016, the relevant temporal gap is even shorter.

I conclude that a reasonable jury could find that Rossing's termination was motivated by the exercise of her rights under the FMLA and that MDMC's proffered reason for her termination was pretextual. I will therefore deny MDMC's motion for summary judgment for Count Four.

## Conclusion

For the foregoing reasons, the Court DENIES defendant MDMC's motion for summary judgment (Doc. #29). Although the Court denies summary judgment, this ruling should not be understood to suggest the Court's views about whether plaintiff's claims are likely to persuade a jury. The parties shall file their joint trial memorandum by March 30, 2020, and the Court will thereafter schedule the case for trial.

12

It is so ordered.

Dated at New Haven this 18th day of February 2020.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge